**SAMINI BARIC KATZ LLP**
Bobby Samini, Esq. (SBN 181796)
Michael Katz, Esq. (SBN 181728)
Steve Baric, Esq. (SBN 200066)
Nicole C. Prado, Esq. (SBN 269833)
John S. Oney IV, Esq. (SBN 338596)
650 Town Center Drive, Suite 1500
Costa Mesa, California 92626
Telephone: (949) 724-0900
Fax: (949) 724-0901
Email: bobby.samini@sbklawyers.com
Email: michael.katz@sbklawyers.com
Email: steve.baric@sbklawyers.com
Email: nicole.prado@sbklawywers.com
Email: john.oney@sbklawyers.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE ROE 1, an individual, JANE ROE 2, an individual, and JANE ROE 3, <br><br> Plaintiffs, <br><br> v. <br><br> INTERNATIONAL CHURCHES OF CHRIST, INC., a California nonprofit corporation; THE INTERNATIONAL CHRISTIAN CHURCH, INC., a California nonprofit corporation; HOPE WORLDWIDE, LTD., a Delaware nonprofit corporation; MERCYWORLDWIDE, a California nonprofit corporation; CITY OF ANGELS INTERNATIONAL CHRISTIAN CHURCH, a California nonprofit corporation; THOMAS | Case No. 2:23-cv-00664 <br><br> **COMPLAINT FOR:** <br> 1. **SEXUAL ASSAULT** <br> 2. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** <br> 3. **NEGLIGENT HIRING, SUPERVISION, AND RETENTION** <br> 4. **NEGLIGENCE** <br> 5. **VIOLATION OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ("RICO") ACT 18 U.S.C. § 1962(C)** <br> 6. **SEXUAL BATTERY IN VIOLATION OF CAL. CIV. CODE § 1708.5** <br> 7. **GENDER VIOLENCE IN VIOLATION OF CAL. CIV.** |

("KIP") McKEAN, an individual; THE
ESTATE OF CHARLES "CHUCK"
LUCAS; AL BAIRD, an individual;
JOE GARMON, SR. an individual; and
DOES 1 through 100, inclusive,

Defendants.

**CODE § 52.4**

**JURY TRIAL DEMANDED**

**[REMAINDER PAGE INTENTIONALLY LEFT BLANK]**

Plaintiffs Jane Roe 1, Jane Roe 2, and Jane Roe 3 (collectively, "Plaintiffs") hereby submit this Complaint pursuant 18 U.S.C. §§ 1961 *et. seq.*, the California Civil Code and the California Penal Code, under federal question and supplemental jurisdiction against Defendants INTERNATIONAL CHURCHES OF CHRIST, INC., THE INTERNATIONAL CHRISTIAN CHURCH, INC., HOPE WORLDWIDE, LTD., MERCYWORLDWIDE, CITY OF ANGELS INTERNATIONAL CHRISTIAN CHURCH, THOMAS "KIP" McKEAN, THE ESTATE OF CHARLES "CHUCK" LUCAS, AL BAIRD and JOE GARMON, SR. and all other named and unnamed defendants (collectively, "Defendants") and states as follows:

## INTRODUCTION

1.     This case involves an **inhumane abuse enterprise of epic proportions** that has been perpetrated and actively concealed by a **ruthless den of sexual predators** wherein, through systemic physical force and psychological manipulation, **women and children as young as 3 years old were repeatedly raped and sexually abused with impunity by trusted church members**.

## JURISDICTION AND VENUE

2.     This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961 *et. seq.*).

3.     This Court has supplemental jurisdiction over all asserted state law claims pursuant to 28 U.S.C. § 1367 because all state law claims are so related to, and arise from, the same common nucleus of operative facts from which the federal claims arise and, therefore, they form part of the same case or controversy under Article III of the United States Constitution.

4.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to the claims occurred in this District. Additionally, the "nerve centers" of the International Churches of Christ, Inc., and The International Christian Church, Inc. are both within the jurisdictional boundaries of the Central District of California.

# THE PARTIES

## A. PLAINTIFFS

5.     Plaintiff Jane Roe 1 ("Jane Roe 1") is a citizen and resident of Orange County, California. Jane Roe 1 was a citizen of the United States of America, and resident of the State of California at the time that she first became a victim and survivor of Defendants' sexual abuse and trafficking.

6.     Plaintiff Jane Roe 2 ("Jane Roe 2") is a citizen and resident of Colorado. Jane Roe 2 was a citizen of the United States of America, and resident of the State of California when she was victim and survivor of Defendants' sexual abuse and trafficking.

7.     Plaintiff Jane Roe 3 ("Jane Roe 3") is 49-year-old a citizen and resident of California. Jane Roe 3 was a citizen of the United States of America, and resident of the State of California when she first became a victim and survivor of Defendants' sexual abuse and trafficking. She is a former member of the Los Angeles East Region ICOC.

## B. DEFENDANTS

8.     Defendant International Churches of Christ, Inc. (the "ICOC") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California. The ICOC purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. The ICOC has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

9.     Defendant The International Christian Church, Inc. ("ICC") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California. ICC purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. ICC has ecclesiastical, governmental, and administrative authority over the business and

conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

10.     Defendant HOPE worldwide ("HOPE") was founded in 1994 by the ICOC and is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of Delaware, with a principal place of business registered with the Secretary of State for the State of California located at 9449 Balboa Ave. Ste. 311, San Diego, California 92117. HOPE purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California.

11.     Defendant MERCY Worldwide ("MERCY") was founded in 2009 by the ICC as a domestic nonprofit corporation and registered with the California Secretary of State as a California corporation. Both the ICC and MERCY listed its principal address at the same address: 2305 30th Street, Santa Monica, California. MERCY purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. MERCY is partially owned by ICC and the principal source of funding for all administrative costs is the ICC.

12.     Defendant City of Angels - International Christian Church ("City of Angels") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California. City of Angels purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. City of Angels has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

13.     Defendant Thomas "Kip" McKean ("Kip" or "McKean"), upon information and belief, is a United States citizen, currently residing in Pacific Palisades, California. At all times relevant to the events that form the basis of this Complaint, Defendant Kip was a member of ICOC's Los Angeles regional branch, and later, the

City of Angels International Church of Christ in Los Angeles, California. Defendant Kip resided in California for extended periods while conducting business in California on behalf of Defendant ICOC and Defendant ICC.  Defendant Kip's supervision, direction, and control over Defendants forms the basis of his personal liability.

14.    Defendant The Estate of Charles "Chuck" Lucas ("Chuck" or "Lucas"), upon information and belief, was a citizen of the United States of America and was residing, at the time of his death, in Thomasville, Georgia. At all times relevant to the events that form the basis of this Complaint, Defendant Chuck was a member of the ICOC, and later, formed another church called Cornerstone. Defendant Chuck resided in Georgia for extended periods while conducting business in California on behalf of Defendant ICOC.  Defendant Chuck's supervision, direction, and control over Defendants forms the basis of his personal liability.

15.    Defendant Al Baird ("Baird"), upon information and belief, is a United States citizen, currently residing in the Los Angeles metro area in California. At all times relevant to the events that form the basis of this Complaint, Baird is a member and Lead Elder of ICOC's Los Angeles branch. Baird's supervision, direction, and control over Defendants forms the basis of his personal liability.

16.    Defendant Joe Garmon, Sr. ("Joe Sr."), upon information and belief, is a United States citizen, currently residing in Tallahassee, Florida. At all times relevant to the events that form the basis of this Complaint, Garmon was a member and leader of ICOC's Seattle and Los Angeles branches. Baird's supervision, direction, and control over Defendants forms the basis of his personal liability.

17.    Plaintiffs are ignorant of the true names of the defendants sued herein as Does 1-100, inclusive, and therefore sue these defendants by such fictitious names. Plaintiffs will amend the Complaint to allege their true names when ascertained. Plaintiffs allege that, at all relevant times herein, Does 1-100 were the co-conspirators, subsidiaries, employees, employers, and agents of constituent members of Defendants herein. Plaintiffs allege that each of the fictitiously named defendants is legally responsible for the actions forming the basis of this Complaint and that Plaintiffs' losses and damages are the result of their wrongful conduct.

**GENERAL ALLEGATIONS**

**INTRODUCTION TO DEFENDANTS' METICULOUSLY CRAFTED,**

**HEINOUS ABUSE ENTERPRISE**

18. Defendants, at the direction and control of McKean and Lucas, have collectively exploited everything good and noble in their trusting and loyal members by through: **psychological coercion and manipulation; pervasive sexual abuse of children as young as 3 years old; and shameful financial abuse**. Each of the foregoing abuses were actively concealed by all Defendants to avert discovery by the police.

19. Founded in 1993, ICOC has become an intricate and intentionally confusing "network of over 700 non-denominational churches in about 150 countries." Throughout its history, ICOC has gone by other names, such as: the Boston Movement, the Discipling Movement, the Crossroads Movement, and Multiplying Ministries, for example. Often, the city in which a local assembly is located is added to the name, for example, Milwaukee Church of Christ and Sarajevo Church of Christ."

20. To ensure Defendants' exploitative conduct remains unchecked, Defendants utilized their vast resources to **silence all internal dissidents through systemic physical and sexual violence**, and if necessary, vexatious litigation. The communal ostracization and isolation from the outside world has caused highly debilitating emotional and mental harm, and in some cases, suicide. Members are systematically deindividualized, only to endure communal isolation from the world at large.

21. Defendants purposefully operate the churches with a strict and documented **discipleship pyramid**, which is a hierarchical system of authority that facilitates the ongoing physical and sexual abuse of church members by insulating predatory church leaders from exposure.

22. Every member has an elder disciple member "over them" that acts as a sort of mentor and jailor. This carefully crafted infrastructure enables the churches to execute and maintain a **micromanaged degree of control over every aspect of every member's life**.

23.     In furtherance of Defendants' Abuse Enterprise, Defendants required victims to confess "sins" daily, however, "disciplers" would share the specifics of these "sins" with other groups and leaders in a gossip-like culture. This allowed McKean and Defendants to use the abuse as emotional blackmail within the community. Abuses were reported to the "disciplers", however, no investigations were initiated and no reports were made to the police by any named Defendant.

24.     Defendants were/are also characterized by **indoctrination of rigid fundamentalist teachings, unyielding compliance with instruction and strict social separatism**. Every new member undergoes a rigid conversion process that is tantamount to systemic brainwashing, called the "First Principles" and once a new member agrees to all indoctrination related teachings, they must be baptized in water and commit to devote their entire life and schedule to the church.

25.     Parishioners are required to forgive any slight, no matter how severe, and "move on" without reporting such abuses. Defendants teach that because "no one is free from sin," judging the conduct of another, no matter how villainous, is beyond the right of any individual. Further, parishioners must protect God's church and modern-day movement from all challenges.

## THE CHURCHES' EARLY ORGANIZATIONAL STRUCTURES CREATED AN IMMOVABLE FOUNDATION THAT FACILITATED THE SYSTEMIC PHYSICAL AND SEXUAL ABUSE OF CHURCH MEMBERS

26.     Founded in Boston in 1979 under the "Boston Movement" moniker by Thomas "Kip" McKean ("Thomas McKean", "Kip" or "McKean") (and 29 other members) through secession from the Church of Christ in Gainesville, Florida. The fledgling "church" quickly sought new members upon formation and enjoyed considerable expansion and success. After the Boston Movement obtained religious and corporate recognition as the International Church of Christ in the 1980's, **ICOC swiftly grew into a multinational movement**. According to the ICOC's self-reported statistics, the ICOC is a body of approximately 700 cooperating Christian non-denominational congregations spread across 144 nations, with more than 120,000 members worldwide.

27.     In 1979, the Church of Christ that helped spawn ICOC and eventually ICC, was jointly led by Charles Howard Lucas ("Chuck" or "Chuck Lucas"), a licensed psychologist at the time, and McKean. It is commonly understood that **McKean, was acutely aware of, the physical, psychological, and sexual abuses Lucas and other church members wrought upon both children and adult parishioners of the church**.

28.     Academic writings, journals, recovered correspondence, newspaper articles, eyewitness accounts, and publications like the book, "Toxic Christianity," which was written by former ICOC leading members under the pseudonym "Mr. X".[1] These are but a fraction of the litany of information depicting the practices and abuses that Defendants have institutionalized to the point of normalcy within the church.[2]

29.     ICOC was incorporated in California in December 1994. Its Articles of Incorporation filed with the California Secretary of State stated that upon dissolution, "the remaining assets of this Corporation shall be distributed to…the individual congregations that are part of the worldwide fellowship of churches of Christ (which are affiliated with the Corporation), if they qualify as distributes under the provisions of this Section."

30.     The International Christian Church (ICC) was founded by Kip McKean in 2006 after he was forced out of ICOC. ICC was registered in California as a nonprofit religious corporation in October 2006, and as of December 2022, ICC listed 104 affiliate churches on its website. Articles of Incorporation filed by ICC with the California Secretary of State included references to affiliates of ICC. One part stated that upon dissolution of ICC, "the assets of this Corporation shall be distributed to other nonprofit funds, foundations or corporations affiliated with the International Christian

---

[1] Toxic Christianity. It's widely believed that Rick Bauer co-published with another church leader under the pseudonym "Mr. X" and can be accessed in its entirety here: http://www.reveal.org/library/theology/Toxic.pdf

[2] Writings from former members and ICOC leaders, in addition to information about the ICOC/ICC churches organizational structure, religious dogma, and their associated analyses can be found at http://www.reveal.org/library/psych/stumpk.html

Church.[34]

31.     Defendants are independently operating a **highly profitable pyramid scheme supported by a web of paper corporations and sham 501(c)(3) entities**, culminating in **hundreds of millions of dollars in illicit gains**. The full extent of ICOC and ICC's profiteering is unknown, especially given the tithing and labor contributions ICOC and ICC routinely coerce from their members.

32.     ICOC and ICC also benefitted from millions in governmental support through SBA loans, authorized under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).[5] Through their veiled abuse of the corporate form and systematic financial exploitation of their members, Defendants have created a cash cow built upon complex layers of deceit and manipulation of their vulnerable members.

33.     One example of a tax-exempt corporation under the ICOC/ICC corporate umbrella is the sham charity organization Defendant HOPE, which has generated over $100 million in tax-free revenue over the last six years.

34.     Chuck Lucas led the CrossRoads Church of Christ in Gainesville, Florida, before he was paid off to leave Florida and start another church in approximately 1986, with the explicit goal that **Chuck would no longer be associated with the ICOC because of his deviant behavior**. ICOC and McKean strategically downplayed Chuck's pattern of abuse by labeling his conduct as "recurring sins." Sadly enough, these "recurring sins" were never investigated by ICOC.[6] Defendants, McKean and

---

[3] Between April 2020 and February 2021, 18 branches of the ICC received Paycheck Protection Program (PPP) loans. These loans totaled $287,490, and a total of $290,040 was forgiven, including accrued interest.

[4] Churches associated with the ICOC appeared to be incorporated into separate entities, according to a review of public records. For instance, the Los Angeles International Church (LAICC), the largest ICOC church by membership, was incorporated in California in December 1990, according to corporate records with the California Secretary of State. The Los Angeles International Church (LAICC) described its structure on its website, noting that it's "organized into eight self-supported regions. Each regional evangelist has been given the charge of equipping the brothers and sisters in his part of the LA church (region) to effectively evangelize his area with the saving message of Jesus Christ as well as helping one another mature in Christ." Notably, "each region has a regional financial advisory group that assists the ministry staff and the Board of Directors with the oversight of the finances in their particular region."

[5] During the COVID-19 pandemic, branches of ICOC received 77 Paycheck Protection Program (PPP) loans, totaling over $9.4 million. Over $9.2 million of those loans were forgiven, including accrued interest. (projects.propublica.org, accessed December 15, 2022; disciplestoday.org, accessed December 15, 2022)

[6] History Repeats Itself: The Rise and Fall of Kip McKean & Chuck Lucas.  Ryan Britt. 2002. Accessed on December 29, 2022 at http://www.reveal.org/library/history/britt2.html

other church leaders were acutely aware of Chuck's disturbing pattern of abuse, but nevertheless actively concealed Chuck's misdeeds to avert discovery by the police.

35.　Chuck died in August 2018, however, Plaintiffs and scores of members witnessed his ongoing abuse of children and adults within the congregation through the end of his despicable life.

36.　Sam Laing, one of Chuck's continued faithful supporters and a prominent lead evangelist with ICOC, was aware of Chuck's deeply disturbing abuses and its chronology. Sam Laing recently made a statement about Chuck in a 2018 article published in "Disciples Today," which is an ICOC owned platform/news source:

> **"Chuck Lucas was a man of deep conviction. He was a disciple of great courage and perseverance. He was criticized, persecuted and attacked for what he stood for, but he never quit. Yes, he had his weaknesses and failures along the way, but he, by grace, repented and overcame them, and was restored."[7]**

## KIP McKEAN FORMS ICC, A CARBON COPY OF ICOC, TO CONTINUE THE SAVAGE ABUSE ENTERPRISE

37.　In or about 2003, Mr. McKean formally split from ICOC after an uprising and various op ed public letters were published by ICOC leaders. He officially formed ICC in or about 2006. ICC encompassed the same guiding principles and culture as ICOC. **ICC was a carbon copy of ICOC, however, ICC eventually eclipsed ICOC in terms of the mania, secrecy and abuse that occurred within its churches**.

38.　From its inception, ICC improved upon ICOC's tools of mass manipulation and exploitation, which aligned with McKean's vow to learn from any past incidents of dissent or divisiveness and ensure that challenges to his authority never occurred in his new "movement of God".

39.　McKean currently oversees all ICC operations from its Los Angeles headquarters and he has completely separated himself from ICOC because he believes

---

[7] Chuck Lucas: A Servant of God. Sam Laing. 2018. Accessed on December 29, 2022.
https://www.dtodayarchive2.org/chuck-lucas-gods-servant-and-how-he-used-him

the entire ICOC congregation is lost, likely because he is no longer the leader. ICC's current membership is believed to include approximately 7,000 individuals.

40.     A former leader of ICC, Coltin Rohn, oversaw the Columbus, Ohio ICC congregation and was **fired for publicly voicing concerns surrounding McKean and other ICC leaders' financial abuse, coercion, and control**. Coltin was a full-time evangelist with ICC but was immediately fired for criticizing the church's tactic of bullying members to give a specific amount of money to the church. Coltin was deeply concerned about the church's practice of threatening a members' salvation and standing within the community if they did not give 10-40% of their annual income to the church.[8]

41.     On or about December 24, 2022, Coltin became aware of an ICC letter, sent out to every ICC member showing the process of "marking" Coltin and his wife. Defendants have continued to threaten anyone who speaks out against the church with vexatious legal actions, disfellowship, and/or "marking."

### THE "DISCIPLING" STRUCTURE IS THE FOUNDATION OF DEFENDANTS' DEPLORABLE CAMPAIGN OF MANIPULATION, PSYCHOLOGICAL ABUSE AND SEXUAL ABUSE OF CHURCH MEMBERS

42.     ICOC was born from a "discipling" movement that arose among the Churches of Christ during the 1970's and the church has maintained this practice in present times. This is a strict practice involving a "discipleship hierarchy" where a formal **discipleship tree or a top-down authoritarian hierarchy** was formed.

43.     Church leadership assigns a specific and strategic discipleship partner to oversee and guide the other member. The "disciplining" movement was memorialized by Flavlil R Yeakley Jr. in a book titled "The Discipling Dilemma". The **rigid and pervasive culture of fear, coercion, control, manipulation, judgment, exclusion, punishment**, along with the church's overt focus on membership growth (i.e., its primary source of income), have resulted in a **widely accepted categorization of**

---

[8] The New York Daily News stated that "dozens" of former members of ICOC "call it a destructive sect that is more concerned with drawing in new members and draining their money than in matters of faith." **One ex-member of ICOC described ICOC as a "pyramid scheme" in which members "were all giving 10% to 40% of our income."**

**ICOC and ICC as toxic, destructive cults**.

44.     Any member's position, health, and wellbeing depend heavily upon success in expanding the congregational rosters. Defendants' leadership created a self-perpetuating business model to attract new recruits/members, and in doing so, generate hundreds of millions of dollars in revenue for the church.

45.     An illustration of the Defendants' hierarchical model of authority is depicted below:

The ICC had a complex and highly hierarchical organizational structure, unusually so for a relatively new and small religious group. There are many layers of leadership, similar to a pyramid or the Roman Catholic Church.



The ICC has a pyramid-shaped, hierarchical structure of authority. At the top was Kip McKean, the *World Missions Evangelist*, and his wife Elena Garcia-McKean, who served as *Women's Ministry Leader* for the group as a whole. As of November of 2002, the Mckeans

46.     In addition to functioning as a life coach to other members, the "discipler" members also acted as de facto therapists. The disciplers would frequently instruct members to conduct themselves in a certain manner and if the member did not heed to the instructions, they were rebuked or labeled as "disobedient" or "arrogant" until they

were eventually "broken" by their sins.

47.    The discipler structure has facilitated Defendants' systemic concealment of abuse and allowed predators to abuse women and children with impunity. For example, on July 1, 2018, Damon and Vicki James, ICC "disciplers" working at the specific direction of McKean instructed a member to refrain from reporting two years of abuse physical and sexual by her husband. Damon James scolded this survivor and stated, "[w]e don't do that to our brothers as disciples."

48.    Vicki James then victim shamed the woman by stating "[w[]hy would you have the heart to press charges?" Damon continued and told the woman, "[w]hat does that gain? That puts you in front of 'the world'." This situation resulted in the woman eventually defecting from ICC and she is trying her best to recover from the years of abuse she endured by her husband and ICC.

49.    The following is a harrowing statement by Carter Whitten regarding the abuse he endured in connection with his "discipler" experience:

> "For reasons I still don't fully understand, my 'discipler' met with me and two other teen boys at one of the boys' houses. In the basement we sat in a circle, and the goal of my discipler was to break me down and to get me to fully understand the horrors of Hell: Meaning what I had to look forward to if I didn't enter the Kingdom (the ICOC) before I died. So next he took it upon himself to paint a vivid picture for me: My discipler described a scene in hell in which I was nailed to a ceiling by my PENIS and spun around by a demon. Hanging only by my genitals, I was forced to watch the devil RAPE my mother repeatedly for all eternity. I was then asked to take that grotesque vignette and multiply its terror by 10,000 (or

some other arbitrarily large number) to catch even a glimpse of how utterly horrifying the future awaiting me was, unless I was to get baptized and be saved. I finally broke down and cried. Which was clearly the goal, as the ICOC famously conducted what they called "breaking sessions."

In addition to completing their entire conversion series of Bible studies, there were even more hurdles I was told I had to clear in order to become a baptized disciple. One is that I had to call the fathers of all the girls in the teen ministry to whom I was sexually attracted, confess my sins of lust after their daughters, and ask for the fathers' forgiveness. I was mortified. I then I asked another teen boy—a good friend of mine, if he had been made to do the same thing before he got baptized. He revealed he had indeed been told to do so, and was terrified by the whole ordeal and shunned by most of those fathers.

The final step was the sin letter or sin list. All disciples-in-training (those studying the Bible) were expected to write an exhaustive letter to God, documenting every single sin they had ever committed in their entire lives and asking for forgiveness. The letter was usually meant to be read aloud in a group setting. I was only 14.

I must have been twelve or thirteen when I realized that almost every conversation or sermon in the teen ministry was talking about lust and masturbation and sexual sin on some level. So now looking back as an adult, I am horrified by how perverse and abusive this culture was. Like many evangelical denominations, the ICOC indulged in purity culture and thus placed a heavy emphasis on sexual purity.

But the ICOC took it to a whole new level, the way that adults dealt with teens in these ministries—children that were not their children—Seems criminal to me. At the very least, it was a gross and egregious abuse of the power dynamic between adults and children. And I know enough people across the country in the ICOC to know that this

was not an isolated incident, it was literally happening in every 'teen ministry.'

But even worse than this, I had a friend that was physically assaulted while he was studying the Bible, because he tried to get up and leave. So the teen leader held him down and beat him up.

We had to meet in one-on-one and group D-times, where we had to confess our sins (especially sexual sins) in a group setting, and the disciplers (teen leaders) would sometimes confess sins as well. During one such meeting, an adult discipler confessed to a group of four or five boys that he had had a wet dream (nocturnal emission) that week, and in many other meetings we were told by disciplers that masturbation equated to "ejaculating on the cross." I never understood why grown men were spending so much time with boys as young as 12 and 13 confessing all their sexual sins to them… I heard things I had never heard before, and it all felt very abusive and inappropriate to me, even as a child.

Why were grown adults grilling other people's teenagers for specific sexual details… When most of these teens had never even had a sexual experience in their life. The abuse of power here and power dynamics were so damaging to most of these teens in the teen ministry, that the PTSD and anxiety and therapy that most of these children have needed their whole lives is astounding."

## CHURCH LEADERS WERE OBSESSED WITH FINANCIALLY EXPLOITING ITS MEMBERS

50.     McKean, along with other ICOC leaders were obsessed with growing church membership and, therefore, **imposed recruiting quotas on members**. All members were required to attempt to recruit a certain number of new members each day and members were also required to bring visitors to all church events. ICOC imposed quotas for everything imaginable. **Members were isolated from outsiders and the church cultivated an atmosphere that promoted and concealed the**

**systemic abuse of women and children within the church**. Members were together every day, and they were not allowed much, if any, contact with family members or friends who were not church members. Of course, the only exception to this strict rule is that members could contact outsiders for the sole purpose of recruitment.

51.     Defendants' members were forced to tithe and give at least 10% of their gross income to the church *and* participate in special contributions for missions approximately twice a year equaling approximately **40 times their normal tithe amount**. The ICOC was relentless in its pursuit for funding and church leadership would resort to **interrogating members about their income**, going so far as to **demand copies of the members' paystubs**. By way of example, if a member gave $4,000 per month, the total mission contributions for that year would equal an additional (40x) and the total required sum would be $160,000 in addition to the normal yearly tithe amount of $48,000. This member would be required to give the church a whopping total of $208,000 for the year!

52.     If the tithing budget was not satisfied, leaders or "disciplers" were forced to contribute the financial shortfall themselves, or members were required to **locate the offending member who failed to tithe and sit on their porch until they arrived home to obtain their tithe funds before Sunday evening was over**. The pressure to comply with the church's rigid demands was a source of anxiety and depression for many members. So much so that **several ex-members committed suicide**.

53.     In 2005, two former ICOC members filed a suit in Tennessee "claiming the church uses cultlike tactics, manipulation, peer pressure and guilt to force members into tithing and making other financial contributions." They alleged that for personal gain, "the Nashville Church, the [ICOC], Hope Worldwide, and Central and South America World Sector jointly participated in a scheme to defraud church members, who are not allowed to inspect the church's financial records."

54.     A former member named Tina witnessed Non-Disclosure Agreements being forced upon parishioners, claiming that they could never talk about the true

finances of the Defendants despite evidence that ICOC opened offshore accounts containing massive quantities of cash.[9]

55.    Moreover, McKean actively solicited church members to turn over their COVID-19 relief money to the church. The following are excerpts of emails from McKean to v~~~~~~~~~~~~~~~~~~~~~

> I would like to address the USA Churches, but I want all of the International Churches to realize "our" unprecedented situation and unprecedented opportunity. Recently, the USA Congress passed a 2 Trillion USD Stimulus Package. Already this week, many Americans received their $1,200 stimulus checks from the government. The World Sector Leaders knew this was coming, so we laid out a plan for every USA Church to help make Missions: 40% of the membership will give all of their stimulus checks; 40% give half; 20% raise their missions contribution pledge some other way. Prayerfully, many churches will exceed these goals!

---

[9] Top leaders of the ICOC put "different ICOC assets and properties in their names" in order shelter and hide those assets "so that the church didn't specifically own them." For example, The Bay Area Christian Church listed its address at the location of the HOPE Technology School for Autistic Children, which was owned by Bay Area Christian Church executive minister Russ Ewell. As of 2022, the property had a total assessed value of $7.7 million, all of which was exempt from taxes under another exemption.  The Bay Area Christian Church also received a PPP loan of $764,600 in April 2020.

**Here are my charges for the USA Churches:**

1. Call your members to give their stimulus checks ASAP. Americans are known to spend everything in their accounts. The great Chicago Church has called these $1,200 checks "Manna from Heaven!"

Presently, all around the world, if a member misses 2 or 3 weeks – usually recognized by missing 2 or 3 weeks of weekly contribution – this is a red flag that they may have become unfaithful. (There of course are always exceptions.) It is a fact that almost every USA Disciple has the ability to give online. So discipling in the COVID-19 Era must include how to give one's weekly contribution online.

Therefore, in the COVID-19 Era to show more forbearance and grace, if a person on your membership has not given for 4 straight weeks – remember this is the USA Churches not third world like India, the Philippines, Africa and some nations of Central and South America – then we must have the conviction that they have become unfaithful to God. At this point, after consulting your World Sector Leader then a decision needs to be made concerning the removal of their name from your membership. However, before that is done, the Evangelist or Women's Ministry Leader must contact them to see if there are extenuating circumstances. Take each situation on a case by case basis.

## ICOC AND ICC MEMBERS WERE SYSTEMATICALLY BRAIN WASHED AND MANIPULATED INTO SILENCE

56.     Initially, early recruits received profound amounts of "love bombing" to lure them into a false sense of security, thereby allowing sexual predators to successfully manipulate them and eventually abuse them with the comfort of knowing these vulnerable and newly brainwashed people would never report the abuse.

57.     Each member is trained to understand, which they come to wholeheartedly believe that in connection with the church, **"compliance was the path of least resistance."** Members sincerely believed they needed to follow the Bible verbatim and **Defendants, including their leadership, were the only "true" modern-day disciples on Earth**.

58.     Church members were a dynamic and diverse group, consisting of scores of successful individuals such as doctors, lawyers, professional athletes, actors, teachers, business owners, PhDs, and **a remarkable number of leaders possessed psychology degrees**.

59.     It is without doubt that their education and training enabled these members to psychologically deplete members and manipulate children and their parents into submission, which created fertile ground for heinous sexual and physical abuse to thrive.

60.     One psychologist ICOC member currently owns a school for autistic children in the San Francisco area and he has been accused of multiple instances of sexual abuse of adults and children/teenagers while he was in Boston. ICOC and McKean were aware of this despicable man's repeated abuse, but **McKean orchestrated his relocation from Boston to San Francisco to conceal his predatory practices and avert criminal prosecution**.

61.     McKean's carefully crafted church hierarchy lent itself to maintaining secrecy and preventing outside intervention. The following is a rough depiction of the church's organizational structure:



62.     Defendants' structure was purposefully organized in this manner to among **ensure the abuse within the church remained a secret to all outsiders**, including the authorities. Indeed, someone within the church was always monitoring lower ranking members and giving them explicit instructions on how to conduct themselves.

63.     Questioning higher ranking members or the church in any manner was frowned upon. Some individuals were "disfellowshipped" or "marked" for being divisive if they asked too many questions or questioned any leaders. A member with either of these labels was **fiercely ostracized by the entire membership, including their families**. "Disfellowshipped" members are essentially excommunicated and shunned from Defendants' communities. Accordingly, being labeled as "disfellowshipped" or "marked" equated to hell on earth and in the afterlife for any member so labeled.

64.     In furtherance of the Abuse Enterprise, the pyramid hierarchy also paved the way for leadership to require that **all ICOC and ICC members receive mental health services (i.e., therapy) *exclusively* from church therapist members**. The therapist members were biased in favor of the church and tailored their treatment and "findings" based on guidance and instruction from McKean and other leaders within ICOC and ICC. These therapist members' strong bias is best evidenced by the fact that a single instance of abuse was never reported to the police. In fact, these therapist members routinely instructed victims to refrain from reporting the abuse to the police, along with instructions to "forgive" the abuser for their heinous transgressions.

## DEFENDANTS CREATED A SICKENING CONVERSION THERAPY MINISTRY TO FACILIATE THE BRAINWASHING SCHEME THAT MANIPULATED ADULTS AND CHILDREN INTO SILENCE

65.     ICOC implemented a LGBTQ+ conversion therapy ministry called **Strength in Weakness spearheaded by Guy Hammond**. Strength in Weakness offers/offered its members three options: live the remainder of their lives celibate; partner with someone of the opposite sex; or continue living their homosexual life of sin and spend their afterlife in eternal damnation. Although "conversion therapy" is banned in several states, **ICOC used this ministry for conversion therapy under the pretext of a support system**. ICOC has held at least 20 Strength in Weakness "conversion therapy" seminars in states where conversion therapy is banned.

66.     The mere existence of Strength in Weakness is nothing short of ironic, as it became **common knowledge within the churches that Chuck Lucas had**

**numerous homosexual relationships with young men in the church**. In a 2022 podcast with Steve Johnson, ICOC evangelist James Lloyd stated:

> "The truth is that the foundational "original sin" of our movement was homosexual sin. Man on man, specifically a male older leader, on young interns. And not just a few times—you can find out, it's not like nobody knows. The fact that our original sin was a senior leader (Lucas) who is respected and loved and training a group of young men—As the leader gets them in a room and shuts the door and this leader (Lucas) 'puts the moves' on these young men. And it's worse than it sounds because those men then became ministers (perpetrators) and went out into their churches and did the same things to others— and I know that personally, because I was in some of those meetings where it was confessed.
>
> They thought it was best not to share this with anybody, and I bought into those reasons. They would say things like, 'He's got children, he's got a wife, you can't just say those things out loud, it could hurt the faith of a young Christian.'
>
> All these things are just the hierarchy and patriarchy saying that we don't need to bring this thing up about 'man on man.' And I don't personally think that this sin is any different than if it was between a man and a woman by the way— I'm only calling it sin because they weren't married.
>
> But the real sin here is that we (church) hid it. People should be taught that this is how our group started. And some of that (sin) has continued for three generations. Some of that trauma was carried on, was passed on to other men as they went out into other (ICOC) churches."

## DEFENDANTS PREYED UPON AND DEFRAUDED COLLEGE STUDENTS

67.    Defendants have increasingly focused on **recruiting college students**. By utilizing college campuses across the globe as its primary hunting grounds, they are

more successful at grooming new members but have an opportunity at pecuniary gain by convincing them to pay for a worthless education. On information and belief, ICOC operates a campus ministry at Pepperdine University under the name "Alpha Omega" to conceal its connection to ICOC.

68.     The practice of preying upon college students resulted in numerous televised exposés in the mid-1990's when the ICOC cult commanded larger numbers, including but not limited to: 20/20 with Barbara Walters, Inside Edition, Fox News, BBC, and MTV.

69.     These news stories were explosive and highly negative representations of the church, as many parents were crying out to the media for help because their college aged children were being brainwashed by a cult. Some parents expressed that they felt like their children were kidnapped by ICOC.

70.     Indeed, ICOC and ICC's exploitation of college students ultimately resulted in the ICOC\ICC being **banned from on-campus recruiting from several schools across the nation**, including but not limited to Boston University, which is situated near the epicenter of the ICOC. Surprisingly, the exposés did not garner enough outrage among the general population, leaving the ICOC\ICC to continue to prey upon college students without repercussion. Until now, the ICOC has had the luxury of the benefits from their long-time obfuscation of their parasitic internal practices.

71.     Mr. McKean is so brazen that he **publicly admitted to defrauding students** by handing out unearned, illegitimate, and meritless doctoral degrees designed to both inflate the importance of its senior members and extract unearned pecuniary gains.

> "The ICC runs an unaccredited college, called the
> International College of Christian Ministries, or ICCM,
> where they are handing out doctorates to anyone they
> choose, where the established course work is limited only
> to literature/books created within the ICC. This is why
> most leaders in the ICC put the abbreviation of "Dr" in
> front of their names, because they have been giving each
> other unaccredited doctorate status. The ICCM has

already brought in approximately $6 million through ICC members attending this unaccredited college."

*"During Covid, while the (financial) giving inside most religious organizations declined, our giving inside of God's Sold-Out Modern-Day Movement steadily increased! Due to our disciples receiving $3000 each in stimulus checks, and approximately $6000 total per couple, these members turned over that stimulus money to the church. As a matter of fact, the sold-out ICC Disciples are now giving $250K every single WEEK!"[10]*

*"In addition to this money, and according to God's promise of always taking care of his people, the Sold-Out movement was further blessed by the government providing SBA loans to our members. Therefore, we were able to bring in $1.2 million of SBA loans to God's sold-out movement. We in turn used this SBA loan money to start 22 churches around the world. Isn't that incredible!! To God be the glory!"*

## DEFENDANTS ACTIVELY CONCEALED ABUSE, INCLUDING THE FORCIBLE RAPE OF A 3-YEAR-OLD GIRL

72.    The active concealment of systemic abuse within the churches by a **den of "religious" sexual predators**, i.e., church leaders such as Mr. McKean and Mr. Lucas, were the impetus of a devious and rampant culture of psychological abuse and manipulation, willfully ignoring the pervasive sexual abuse of children and adults throughout the churches and actively concealing abuse from the authorities.

73.    In furtherance of efforts to protect the church and its primary source of revenue (its members) at all costs, Defendants attempted to cover up these disgraceful crimes by manipulating members with remarks from McKean such as:

> ***"We cannot report these abuses, because it would hurt our church, which is God's Modern-Day Movement."***
> ***"Do you want the fall of God's modern-day movement on your head???!!"***

---

[10] Currently, the sold-out ICC Disciples are now giving approximately $360K per week.

> *"The cause of protecting God's Kingdom on earth is more important than the sin or the pain of a few individuals."*
> *"We need to forgive our brothers who sin and realize that they are a new creation in Christ, and give them a chance to make things right. If we report them, it will destroy their lives and hurt the church."*

74.     In addition, the church engaged in strategic victim blaming and victim shaming. For example, **young children who were abused were later blamed for that abuse when the ICOC would assert how their clothing was "too provocative"**.

75.     One former member of the East Region Los Angeles ICOC was pressured and ultimately convinced to refrain from reporting her 3-year-old daughter's abuse. She was told that if she reported the abuse, it could "ruin everything" and bankrupt the church. McKean himself contacted this woman and personally thanked her for her "loyalty" and for not reporting the abuse to the police. He congratulated her on her strength and courage to endure the situation with such faith.

76.     An ICOC affiliate, formerly known as AMC Ministry of the Los Angeles ICOC, and currently known as **Turning Point Church has similarly facilitated and concealed abuse**. Recently, Turning Point Church claimed publicly that no sexual abuse has occurred in their church, however, there are at least three survivors that reported abuse to staff members who took no action whatsoever in connection with the reported abuse and never alerted the congregation to the existence of sexual predators, some of whom worked in Kids Kingdom (children's ministry), among them. Turning Point Church's leadership that ignored reports of abuse include the following: Kevin and Tracena Holland, Mike and Kim Upton and Jay and Traci Minor. In addition to the foregoing, Turning Point Church uses a licensed "Marriage & Family" counselor named David Bruce, who is a mandated reporter. Mr. Bruce, notwithstanding his knowledge of abuse, refused to report several instances of abuse and helped conceal the abuse for the Defendants' benefit.

77.     One former member of the Los Angeles ICOC and the Turning Point Church, Sandi Derby, Advanced Grief Recovery Specialist, Trainer for The Grief

Recovery Institute and Ordained Minister, has "firsthand knowledge that allegations of sexual, physical, and psychological abuse of teens and adults were brought to leaders in Turning Point in 2019 for abuses that occurred in the early 2000s." This former member witnessed leadership's failure to support the abuse survivors and their failure to report the abuse to the police. As a result of her open support for the survivors, this former member was discredited within the church, which eventually led to her defection.

78.    The Hampton Roads ICOC location in Virginia has also received reports of abuse and done nothing in response. Specifically, Ed and Dr. Deb Anton were informed of the sexual abuse of a teen ministry member and refused to report the abuse or alert the congregation to the existence of a sexual predatory within the church.

## DEFENDANTS' DOCTOR MEMBERS ILLEGALLY MEDICATED YOUNG CHILDREN IN FURTHERANCE OF THE ABUSE ENTERPRISE

79.    Defendants did not stop with physical, psychological, and financial exploitation. Many children, such as Anthony Stowers, were administered medication by church affiliated "doctors". Often, the affiliate doctors such as Dr. Kris Stowers (Anthony's uncle) would administer medications that were prescribed for other conditions or children received medication for conditions for which they were never diagnosed. To conceal their illegal conduct and minimize scrutiny, **Defendants' doctors provided the children with medication in unmarked or mismarked bottles**.

80.    One of these affiliate physicians is a staff doctor at Florida State University and another that has **administered medications to children for mental illness despite lacking any qualification to do so medically or through public license**. On information and belief, this physician is an orthopedic surgeon for athletes.

81.    **Medicating children has also facilitated the ICOC's clandestine efforts to conceal the ongoing child abuse from anyone outside the church**. The children were persuaded to believe, through strategic pharmacological deception and psychological manipulation, that they were never abused and if their own memories seem contradictory, then their memories were faulty.

**McKean and Defendants Used Children's Ministries to Effectuate the Abuse Enterprise**

82.     The children's ministry was named the **"Kids Kingdom", which served as a demented playground for the sexual predators within Defendants' churches**. Countless instances of abuse happened within the Kids Kingdom, as the program hosted mission trips (HOPE Worldwide), social events and the children frequently visited members' homes.

83.     Defendant HOPE Worldwide is ICOC's benevolent arm wherein teenagers took mission trips around the world to spread God's Word. Many of these children who were participating in what they believed to be an evangelical trip, were ultimately sexually abused by vile adult men. Children and/or their parents reported the sexual abuse, including rape, to elders and doctors (i.e., mandated reporters) within the church, however, the church never bothered notifying the police of the illegal activity. **There were no instances of any ICOC medical doctors reporting the abuse to anyone, let alone anyone outside the church**.

## <u>DEFENDANTS PROMOTED THE DEPLORABLE PHYSICAL ABUSE OF CHILDREN UNDER THE GUISE OF DISCIPLINE</u>

84.     In addition to sexual abuse, ICOC and ICC children were routinely physically abused under the pretext of "discipline". Church leadership often recited the following commonly known passage from Proverbs 13:24 as justification for child abuse: "Those who spare the rod of discipline hate their children. Those who love their children care enough to discipline them."

85.    For example, members were instructed to **spank children, including infants, with a wooden paddle, custom made with a heart shaped hole in it, to create a more aerodynamic and effective (painful) spanking device**. A true and correct image of the heart shaped paddle is depicted below:



86.    Members were instructed, with visuals, how to **use corporal punishment without leaving bruises, welts or red marks, so the offending members could not be reported to child protective services**. One former member recalls frequently seeing young children at church with welts or bruises on their thighs. On one occasion, this member witnessed a child with a "heart shaped welt" on his/her body.

**1,200,000 PEOPLE DEFECTED FROM ICOC AND ICC AFTER ABUSES WERE EXPOSED**

87.    Since at least 1979, ICOC and ICC have averted authority suspicion notwithstanding the fact that in excess of the last 40 years, **predatory members have**

**escaped prosecution for countless instances of sexual abuse (children and adults), physical abuse (adults and children), spousal abuse, and emotional abuse**.

88.     From its inception in 1979 to the present, approximately **1,200,000 souls defected from ICOC**. The large number of defectors is due, in large part, to the explosive growth that ICOC experienced.

89.     For three consecutive years, the ICOC was labeled in the religious world as the **fastest growing church on the planet**. Simply put, ICOC's growth was nothing short of profound. On the other hand, its bleeding was also profound, because members defected in record numbers as they became increasingly aware of the heinous, pervasive abuse of children and adults and the corresponding cover ups. These courageous souls would simply disappear, never again to be seen by anyone in the church.

90.     According to some of the most respected cult experts around the world, including but not limited to Dr. Steve Hassan PhD, Defendants are some of the most dangerous cults in existence. This is primarily because of the church's insidious tactic of masquerading as the Christian church next-door with deeply rooted Biblical foundation. On its face, this public image of the church seems innocent and believable, however, **the church's internal machinations are characterized by unmitigated systemic and chronic physical and sexual abuse of children and women within the church**.

91.     Defectors have since revealed the abuse they suffered and/or witnessed at ICOC and ICC. Former member Lisa Johnson who as a top leader in New York City and a friend of McKean, in a podcast called "Eavesdropping" made the following comments regarding the church, based on her personal experience: — I'll close out with two soundbites from video evidence. The first one is by Lisa Johnson from a recent episode of her podcast called "eavesdropping."

> *"Women (in the ICOC) are getting ground up, and I mean tons of people, it's not an isolated case here and there….And I think about these women now, after all these years…*

*So I'm gonna bring up something here…*

*…The sexual abuse….there has been sexual abuse, there has been emotional abuse, and there has been some physical abuse of women… and part of that is the issue of patriarchy. We developed a system and a way that was not safe for women….There are women that have been very damaged and ground up by that.*

*The fruit of this is so obvious, how can you miss it?! How many women have been told to stay with their physically abusive husbands and how many women have been sexually abused?!"*

## DEFENDANTS SHAMELESSLY AND REPEATEDLY REFUSED TO REPORT PEDOPHILES WHO WERE LATER ARRESTED AND PROSECUTED

92.     Several pedophiles have been arrested in connection with various abuses. These individuals committed numerous crimes before the police intervened and are a miniscule representation of the true number of predators who have operated with impunity within the church since 1979.

93.     In January 2012, David Iburg, aka David Saracino ("Mr. Saracino" or "David Saracino") was sentenced to 40 years of hard labor in the State of Louisiana, the maximum sentence, for **forcible rape upon a 4-year-old girl in 2004**.[11] The prosecutor, Cynthia Guillory, told the judge that he was among the worst of the worst. Mr. Saracino purposefully sought out women who were vulnerable and struggling financially so he could gain access to and victimize their young children. Mr. Saracino faced charges and convictions in Texas, Utah and Louisiana, where he received the 40-year sentence.

94.     Mr. Saracino attended the East Region of the LA ICOC, where several members (single mothers) of the ICOC reported to the leaders in the East Region in or

---

[11] *State v. Iburg*, 12-2720 (La. 5/17/13), 118 So.3d 372

COMPLAINT

about 1998 that David Saracino had continuously molested their daughters. Ultimately, several police reports were filed by the parents, while the ICOC remained silent. Just as the ICOC did nothing to address these reports while David escaped to the San Diego ICOC and freely resided in the Escondido area temporarily Like so many others, these mothers were told not to share with anyone else what David had done, as it would "hurt the church." David ultimately disappeared uncaptured. David was free to go on a nationwide crime spree, abusing and raping little girls along the way. David was finally caught, but only an episode of America's Most Wanted produced credible leads that resulted in his capture. Had ICOC assisted in his arrest or alerted their congregations, David Saracino could not have continued abusing children with reckless abandon. ICOC's commitment to abject apathy is sickening and clearly intentional.

95.    Since December 31, 2022, at least four previously unknown victims from the East Region Los Angeles ICOC have come forward regarding the abuse they endured, and it is believed there are scores of additional victims who are either too entrenched in the church or too scared to tell their stories.

96.    In or about February 2018, a volunteer soccer coach named Waldo Milla-Guerra of Middlesex County, New Jersey was arrested on charges of possession and distribution of child pornography. Mr. Milla-Guerra volunteered at the South Brunswick Soccer Club and formerly taught at Kid's Kingdom at Central Jersey Church of Christ in North Brunswick.

97.    In 2005, Benjamin Samuel Speights, a member of the south region of the LA ICOC, was convicted for lewd and lascivious acts against a child under the age of 15. Mr. Speights' unlawful conduct included forceable participation of a 14-year-old girl to create pornographic videos that he sold.

98.    In December 2020 Mr. Speights was convicted in Arizona in connection with a Class 2 felony of sexual exploitation of a minor as part of a negotiated plea deal related to child pornography charges. Mr. Speights was a leader in the "Kid's Kingdom" ministry in the El Segundo South Region of the Los Angeles ICOC. Several children at this ministry reported his physical abuse. Without a doubt, Mr. Speights has a sordid and despicable history of abusing children. Consistent with their historic

complicity, Defendants never reported the abuse these children endured or attempted to prevent future abuses.

99. Nicholas Griffin Lombardi ("Mr. Lombardi") is another example of a known pedophile abusing children within Defendants' churches. He was a long-standing member of the ICOC, as were his parents.

100. On or about November 27, 2022, as a clear demonstration of kind of monster Mr. Lombardis, Mr. Lombardi posted on his personal Facebook page "I kind of have a fantasy of fucking a child ha[.]"

101. Mr. Lombardi was convicted for lewd and lascivious acts against a child under the age 15. In addition, there are numerous accusations of abuse against Mr. Lombardi, however, Defendants refused to report his abusive conduct to the authorities, and he remains free to continue abusing children with impunity.

102. In approximately August 2011, one ICOC abuser, William (Bill) Thomas McLaughlin, was sentenced to 6 years to life, followed by 10 years to life of parole for various counts of felony sexual assault on a child by a person in a position of trust.[12] He abused approximately 10-15 individuals, all of whom were expelled or in some fashion pushed out of the Denver ICOC as punishment for failing to comply with the leaders' commands.

103. Tomotaka ("Tom") Andrews Wilton of the Portland, Oregon ICC location raped his daughter[13] for years and church leaders, including McKean, were acutely aware of the abuse but did nothing to protect his daughter or other children from this despicable predator. He was convicted in Idaho in 2009 of two counts of third-degree rape of a child and is now a registered sex offender. On information and belief, Mr. Wilton remains a member of the Portland ICC and is free to abuse other children.

---

[12] https://castlerocknewspress.net/stories/denver-man-sentenced-in-douglas-county-for-sex-assault-on-child,117951

[13] http://www.isp.idaho.gov/sor_id/SOR?id=35071&sz=1360; https://www.homefacts.com/offender-detail/IDSX35071/Tomotaka-Andrews-Wilton.html

## Tomotaka Andrews Wilton Registration Details

Last Known Address: 2509 W BOISE AVE
BOISE, ID 83706-2920
ADA COUNTY, ID



| | |
|---|---|
| DOB: | 1971-11-04 |
| Race: | Asian Or Pacific Islander |
| Sex: | Male |
| Eyes: | Brown |
| Height: | 5 ft 3 in |
| Hair: | Brown |
| Weight: | 173 lbs. |

**Tomotaka Andrews Wilton - Registered Sex Offender**

**VIEW CRIMINAL RECORD**

## Offense or Statute

Offense/Statute:   Rcw 9a 44 079 Rape Of A Child In The Third Degree
                   Charge Correlation Pending
Date:              17 March 2009

## <u>SPECIFIC ALLEGATIONS</u>

### <u>The Abuse and Torture of Jane Roe 1</u>

104.   Jane Roe 1 was recruited into the ICOC in the South Bay Region in 1990, as a college student, and was immediately put into leadership, as the ICOC preyed upon college students and anyone that they deemed "sharp." Part of the damaging culture within ICOC required that Jane Roe 1 go on forced "pure" group dates, which she did not want to do. The day after she was "baptized into" ICOC, she was forced to go on a date with a "brother" that she had no interest in and felt uncomfortable around. The dating rules inside ICOC were oppressive and disturbing. If members refused any dates, that member would be rebuked for being selfish and prideful.

105.   The **attractive single members of the ICOC were used as bait to lure new members into the fold**. When members were attending Bible studies, called "First Principles," they were instructed to parade the attractive "brothers and sisters"

in front of the potential new recruits. The new recruits were told: "If you become a baptized disciple of Jesus Christ, then these are the types of people that you will be allowed to date."

106.   Shortly after Jane Roe 1 joined ICOC, some of its leaders orchestrated her relocation to the Orange County Region to help lead a ministry. At their urging, she dropped out of film school at Long Beach State and moved to Orange County. This was not the last time ICOC leadership demanded that Jane Roe 1 uproot her life and relocate for the sake of "God's Modern-Day Movement." During her 17 years as an ICOC member, **she was forced to relocate 27 times**. This was undoubtedly calculated to further isolate Jane Roe 1 from friends and family and create a situation where the only consistent community she had was fellow ICOC members.

107.   Once in Orange County, Jane Roe 1 began working full-time as an intern and worked 24/7, yet she barely made enough money to pay her rent each month after she gave the church a substantial portion of her gross income. As a result, she was forced to work part-time to supplement her income and simply survive.

108.   In approximately early 1996, Jane Roe 1 went on another ICOC supervised date with a man she knew for four months before becoming engaged to be married. This man was a stranger to Jane Roe 1 when they married, as ICOC members were not allowed to be alone together, or to have any intimate conversations. Even their phone calls were monitored and timed, which demonstrates the high degree of control the church imposed upon its members.

109.   What Jane Roe 1 did not understand at the time but would later learn is that this protocol was part of what she now describes as "Marriage Trafficking" wherein ICOC routinely and systematically micromanaged who members could date and eventually marry.

110.   Jane Roe 1 was given one month to plan the rushed wedding. As she frantically tried to plan a wedding she could not afford, she was nevertheless expected to convert and baptize new recruits while meeting all quotas and "baptism predictions." Jane Roe 1 remembers a time where she did not sleep for three days straight during this chaotic and stressful process.

111.   When one of her "visitors," a potential recruit, that she brought to church displayed a romantic interest in her, Jane Roe 1's ICOC Sector Leader suggested to her that she be the "carrot" and get him somewhere in public with her so she could share some of her favorite scriptures with him. This was ICOC's version of innocent flirting for God's cause. When this man, who was approximately 30 years old, suggested that they meet at Jane Roe 1's apartment and then walk to the coffee shop across the street, she had no cause for alarm and believed she would be safe. Once he arrived at her apartment, he told Jane Roe 1 that he was in a hurry and needed to use her restroom. He then suggested they make some hot tea and sit on the couch to read scriptures together.

112.   Almost immediately, this man approached Jane Roe 1 from behind, grabbed both of her arms, pinned them behind her back, and dragged her into her bedroom, all while she fought like her life depended on it and screamed at the top of her lungs for help. He kicked the door shut, threw Jane on the bed, ripped off her clothes and violently raped her while strangling her and causing her to black out for a few minutes. When he was finished raping her, he quietly dressed and left her apartment.

113.   After the rape, Jane Roe 1 was in shock, shut down and went into a catatonic state for a few days. Jane Roe 1 did not plan on telling anyone about the rape, but she was forced to tell a few of the "sisters", because bruises and finger marks formed on her neck where he had violently choked her and one of the sisters accused her of having a "hickey" on her neck.

114.   Jane Roe 1 asked this sister to promise she would not tell anyone about the rape because she had seen the manner in which other sexual assault victims were treated in the ICOC. Women were always blamed and victim-shamed, gossiped about, and humiliated for being raped. Most rape survivors were discredited and not believed while the "brothers'" stories were always believed by the congregation. Jane Roe 1 was acutely aware that men were not supposed to be in her apartment and she firmly believed that she would be blamed for her rape.

115.   ICOC required all its members to date "purely", which means there was no physical intimacy, even kissing, allowed before marriage. Moreover, all couples

were required to participate in "pre-marriage counseling" before marriage. These "counseling" sessions occurred between the individuals and their respective "disciplers" and usually a few other ICOC members. None of the ICOC "counselors" were educated or licensed in the counseling field. During these "counseling" sessions, **Jane Roe 1 was forced to share all her previous sexual experiences**, which was a humiliating and degrading experience. After she disclosed her personal information, "counseling" leaders relayed her information to her fiancé's "counseling" team. All of this occurred at a vulnerable time when Jane Roe 1 was coping with the recent trauma of being raped three weeks prior.

116. After Jane Roe 1 and her new husband returned from their honeymoon, the couple that was "discipling" the newlyweds, Bruce and Robin Williams (Orange County Region leaders), invited them over for dinner with several leaders from Orange County. Jane Roe 1 endured another traumatic instance of sexual control and invasion at this dinner. During dinner, Bruce Williams, loudly and proudly said to Jane Roe 1, "so how was the sex?!" Jane Roe 1, embarrassed by being asked something so personal in front of a table with 8 other leaders, was shocked and remained silent. Bruce Williams inquired further and asked, "Wait a minute, did you even have an orgasm?!" Jane Roe 1 was mortified and nervously blurted out, "No I did not." She immediately excused herself from the table, rushed to the bathroom and sobbed.

117. After Jane Roe 1 returned to dinner with the group, Bruce Williams told her that if she was going to be having an unhealthy sex life (i.e., without orgasms), then she could not be a leader in the married ministry because she could not be a good example to the other married women. Bruce Williams instructed Jane Roe 1 to "practice at sex" with her new husband and to call Bruce and report whether she was having orgasms during sex with her husband.

118. The sexual control and humiliation did not end with Jane Roe 1's sex reports to Bruce Williams. On at least two occasions Bruce Williams cornered her to ask highly inappropriate questions about her sex life. On one of those occasions, he isolated her in the backseat of his car in a dark Chili's parking lot and he asked her graphic questions to "check in" so he could determine how her sex life was progressing.

Bruce Williams specifically asked her, "Do you get wet enough, do you think it's a lubrication problem?" Jane declined to answer his embarrassing and crude question; she began crying, fumbled for her keys in his dark backseat, jumped out of his vehicle and ran over to her car.

119. On one occasion inside a restaurant during a discipleship meeting otherwise known as "D-times", Bruce Williams asked his wife Robin to tell Jane Roe 1 how to masturbate while in the bathtub. Bruce also asked Jane Roe 1 if she knew where her clitoris was located and then bragged about his supposed vast knowledge of female anatomy. Bruce suggested that Jane Roe 1 drink a little wine before having sex with her husband so she could "get her buzz on and get wet." Bruce and Robin also asked Jane Roe 1 if she rode horses while growing up and suggested that this activity could have caused damage to her clitoris. As a result, Bruce and Robin suggested that Jane Roe 1 make an appointment with a woman in the ICOC who was an OB/GYN to confirm her genitalia was working properly.

120. At the end of 1996, Jane Roe 1 received the "healthy sex life" stamp of approval from Bruce and Robin Williams and she and her husband were asked to lead a married ministry in the East Region of the Los Angeles ICOC that was led by Steve and Jacqueline Gansert-Morici. This meant that Jane Roe 1 and her husband would be "discipled" by a couple named Rodney and Denise going forward.

121. Jane Roe 1 felt a camaraderie with Rodney and Denise, and one day, while helping Rodney organize some of the items in his garage, they discussed abuses they endured. Jane Roe 1 inadvertently blurted out that she had been violently raped in Orange County.

122. A few days after Jane Roe 1's confession to Rodney, the East Region staff was scheduled to go to Big Bear Mountain for the staff leader's Christmas retreat. Jane Roe 1 knew that Steve and Jacqueline and Bruce and Robin would be there, and she was very concerned because Rodney knew her secret. Rodney went to his car to retrieve gifts for everyone, but to everyone's surprise, Rodney left the site without explanation. Not even Rodney's wife knew where Rodney was, so his wife Denise immediately drove back to their house to check on him and discovered that their house

was empty. Rodney had taken all their personal belongings and disappeared. Thereafter, Bruce and Robin asked Jane Roe 1 and her husband to take over Rodney and Denise's group and lead the sector, to which they reluctantly agreed. After Rodney and Denise were no longer leaders in ICOC, Jane Roe 1 and her husband were "discipled" directly by Steve and Jacqueline, which created more trauma for Jane Roe 1. Jacqueline was coercive and harsh and blamed Jane Roe 1 for her husband's need to masturbate while fantasizing about their intern. Steve and Jacqueline dispensed similarly controlling and abusive sexual advice Jane Roe 1 repeatedly.

123.   Jane Roe 1 was required to attend weekly marriage counseling sessions with ICOC members who were not licensed counselors and in no way qualified to counsel anyone. Several ICOC leaders urged that Jane Roe 1 visit Dr. Ramona Garnier, a psychologist in San Diego who was also an ICOC member. Jane Roe 1's sessions with Dr. Garnier were unhelpful and was nothing more than a drain on Jane Roe 1's empty bank account. As a result of Jane Roe 1's deeply entrenched religious indoctrination and brainwashing, she continued to suffer in silence because she believed that being in an unloving and emotionally abusive marriage was her penance.

124.   As a result of 17 years of abuse and devastating trauma, Jane Roe 1 became ill and her body broke down from the extreme emotional stress. She suffered from heart issues, infections, and was in complete adrenal failure. Several of her doctors told her that if she did not leave ICOC and radically change her lifestyle, they feared she would not live long enough to raise her children. Jane Roe 1 took this medical advice, and fled her destructive marriage, and escaped from the ICOC.

125.   Despite the years of abuse, after she defected, Jane Roe 1 contacted numerous ICOC members and leaders to discuss her own abuse and gain some closure. Over the last 10 years, she sent 63 emails to various leaders and members of ICOC, including Steve and Jacqueline Gansert-Morici. Unsurprisingly, not a single member was willing to meet with her, or willing to talk about the abuse she endured for 17 years. Instead, she received a few condescending emails, most of which told her to "forgive and move on".

126.   As a direct and proximate result of the abuse, at the hands of ICOC, and

its leadership, Jane Roe 1 suffered and continues to suffer a litany of injuries. Among other injuries, Jane Roe 1 has experienced and will continue to experience for the rest of her life severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

**The Abuse and Torture of Jane Roe 2**

127.   Jane Roe 2 currently resides in Denver, Colorado. Her abuse and grooming began in Massachusetts, followed her to Washington and ultimately culminated in California.

128.   In 1987, after years of listening to cassette tapes of Kip McKean, Jane Roe 2's mother was fully indoctrinated in the Boston Movement and convinced her father to leave their home and his business in Connecticut. The family moved to Lexington, MA and Jane Roe 2's parents attended Kip's Bible study. Kip put Jane Roe 2 in contact with the leaders of the youth ministry. Jane Roe 2 was a sophomore in high school at the time and she was struggling with adjusting to her new life in Lexington.

129.   Jane Roe 2 was baptized into the church as a teenager, and she became interested in another teenage member, Joey Garmon Jr. ("Joey Jr.") The church had strict rules that prohibited teenagers from "going steady", however, Joe Garmon Sr. ("Joe Sr.") somehow convinced Kip McKean to allow Jane Roe 2 and Joey Jr. to date. They maintained a "pure" relationship, which meant there was no intimacy allowed and the teenagers could not be alone together. Jane Roe 2 strictly abided by these rules, as she sincerely believed that disobeying church leadership was akin to disobeying God. Thus, disobeying church leadership in any manner meant that Jane Roe 2 could go to hell for defying leaders/God.

130.   Periodically, Joey Jr. confessed "impurities" to Jane Roe 2 and asked for her forgiveness. On one occasion, he confessed to having a sexual relationship with an adult female worker in the teen ministry. Joey Jr. confided in Jane Roe 2 that he had confessed this "impurity" to his leaders and that they "handled it".

131.   On another occasion, Joey Jr. confessed to sexually abusing an infant prior to moving to Boston from Florida. At the time Joey Jr. made this confession, Jane Roe

2 was 16 years old, and she was not familiar with the concept of child molestation. She was confused by Joey Jr.'s confession and did not know what to make of the information or what to do with it since she had lived an extremely sheltered life in the church, and its members were her entire universe. After inquiring further with Joey Jr. about the incident, he told Jane Roe 2 that he "repented," but that he had significant guilt because the baby had died shortly after his abuse. Joey Jr. told her that the church leaders, Defendants McKean and Baird, knew about his history of abuse and that his father also had a sordid "past". Jane Roe 2's understanding, from Joey Jr., was that the Garmon family moved to Boston because Joe Sr. was sleeping with his secretary in Florida, which was another appalling abuse of power.

132.   In 1989 when Jane Roe 2 was 18 years old, she left with the Garmon family to start the Seattle chapter of ICOC. The Garmons insisted that Jane Roe 2 go with them to Seattle, and the invitation was presented to her as a "privilege to serve with the Garmons." Unfortunately, in ICOC Jane Roe 2's parents had little influence in her life, so ICOC became her ultimate source of authority on Earth.

133.   Consequently, Joe Sr. became Jane Roe 2's spiritual leader and he required total obedience, to which she always complied out of fear for going to hell for disobeying her leader and by extension, God.

134.   Jane Roe 2 drove to Seattle with the Garmon family and lived with them for the first month. During this month of cohabitating with the Garmon family, Joe Sr. included her in the family as one of his own children. This, unfortunately, meant that Jane Roe 2 was also subjected to Joe Sr.'s whims and frequent fits of rage, all while she was expected by Joe Sr. and the church to "grow the ministry". Jane Roe 2, along with all members, were expected to baptize recruits every week without exception. The pressure to meet Joe Sr. and the church's baptism requirements was enormous. Teenagers like Jane Roe 2 worked countless hours to recruit new disciples and were expected to work without any payment, all for God's glory. This is starkly contrasted with the church's requirement that all members give at least 10% of their gross monthly income to the church. The church sought to extract as much money as possible from its members while forcing teenagers to work obscene hours recruiting these new

members for free.

135.   In 1990, the rest of Jane Roe 2's family moved to Seattle and her sister began dating Joey Jr.'s brother, John Garmon. Her sister would tolerate Joe Sr., even though Jane Roe 2 witnessed him yell and scream at her sister, sometimes chasing her around the house.

136.   Jane Roe 2's brother was also a member of the Seattle ICOC and he witnessed many financial improprieties. On one occasion during a church service at the Garmon home, Joe Sr. became enraged after he learned of the low amount of tithing money collected. Joe Sr. insisted that they continue passing the collection plate around until he received the amount of money that he thought was due to him. Demanding specific amounts of money to be collected was a common and disgusting practice at ICOC.

137.   In approximately 1992, Jane Roe 2's brother confronted Defendant Baird about misappropriation of tithing money that was supposed to be donated to the poor and other abuses he witnessed. Defendant Baird refused to take any action whatsoever in response to receiving this information. As a result of his whistleblowing, Jane Roe 2's brother eventually defected from ICOC after leaders told him that he "knew too much".

138.   Church meetings were held at the Garmon home and Joe Sr.'s bedroom was frequently used as a private meeting space. Joe Sr. was often heard screaming at and berating whomever was in his bedroom. Typically, women were called to Joe Sr.'s private meeting area (i.e., his bedroom) more than men, and he seemed to have an unusually close relationship with women leaders, however, he did not have a similarly close relationship with the husbands. Individuals witnessed Joe Sr. take very young girls, pre-teens and teens, back to his bedroom. Eventually, Joey Jr. told Jane Roe 2 that he believed his father was having an affair with another woman and other members, which was subsequently confirmed by Marty Fuqua.

139.   Around this time, Joey Jr. confessed to Jane Roe 2 that he was going to adult stores after their weekly date. Jane Roe 2 was then taken into the sauna by Edie

Garmon, (Joe Sr.'s wife and Joey Jr.'s mother). Edie read scriptures to Jane Roe 2 about forgiveness, and she implored Jane Roe 2 to forgive Joey Jr. for his sexual sins. Shortly thereafter, McKean and others gave Jane Roe 2 and Joey Jr. "permission" to get engaged.

140.   After the engagement, Jane Roe 2 noticed a significant and disturbing change in Joe Sr. He would kiss her on the lips, which she innocently attributed to becoming his "daughter". He asked her to Waltz with him in the Garmon living room and he would hold her tightly and intimately caress her and slide his hands down her back. Coincidently, Joey Jr. became more possessive of Jane Roe 2 because he did not trust his father and no longer wanted her around Joe Sr.

141.   On one occasion, Jane Roe 2 and Joey Jr. were standing in the Garmon kitchen when he told her she could not wear tampons after they were married. She was shocked, confused and did not understand this abrupt attempt to control her body. This was the first time she understood the substantial degree of control Joey Jr. would have over her once they became husband and wife.

142.   Joe Sr. began inviting Jane Roe 2 to his bedroom for private sessions to discuss marriage. On one of these occasions, Joe Sr., while in bed with his wife Edie, asked Jane Roe 2 how she felt about having sex. The couple showed Jane Roe 2 a dirty washcloth that they used for "hygiene" after having sex, and they lured her into an uncomfortable discussion about Jane Roe 2's body. Joe Sr. went so far as to ask Jane Roe 2 about the size of her nipples, and he inquired if she was uncomfortable with her large breasts. He indicated that his son would be happy with her breast size.

143.   One night, everything exploded with Joe Sr.'s sordid and extensive sexual universe, as **Joe Sr. went into the bedroom of his young personal secretary while she was sleeping, and he groped her body and breasts**. She awakened to the assault, ran out of the house screaming in her pajamas, and called another leader from a pay phone. As a result of these events, Jane Roe 2 and Joey Jr. were relocated by the ICOC to Los Angeles.

144.   As a woman, Jane Roe 2 was not allowed to attend "confession" meetings, so she is unsure of the actual narrative ICOC used to explain these events. Once Jane

Roe 2 and her husband arrived in Los Angeles, McKean assigned Marty and Chris Fuqua to "disciple" Jane Roe 2. She moved into the Fuquas' home shortly after the relocation and worked as a nanny for their children off and on for 5 years. Jane Roe 2 ended her relationship with Joey Jr. shortly after their arrival in Los Angeles.

145.   It was Jane Roe 2's understanding that the Fuquas oversaw the "discipline" of the Garmons after their sexual improprieties were revealed. On information and belief, Russ Ewell, McKean and Baird and other San Francisco ICOC leaders were also involved in the disciplinary meetings and decisions. All ICOC members were strictly forbidden from discussing anything related to the Garmon improprieties and corresponding discipline.

146.   The Fuquas seemed sympathetic and told Jane Roe 2 they could help her process the trauma. They asked her questions about her discussions with Joe Sr. regarding sex and her breasts. The Fuquas told Jane Roe 2 she was not the only person who had this type of experience with Joe Sr. At this time, Jane Roe 2 learned from another member that Joe Sr. was having sexual affairs with several female ICOC women and at least one of his minor daughters.

147.   Although Marty Fuqua and Al Baird were aware of the sexual trauma inflicted upon Jane Roe 2 by the Garmon family, he nevertheless asked her highly inappropriate, sexually charged questions after she married. For example, right after returning from her honeymoon, Marty pointedly asked, "Did you climax?!" Al and Gloria Baird asked Jane Roe 2 every week, "How much sex are you guys having?" Unfortunately, these awkward sexual questions were normalized within ICOC, as most of Jane Roe 2's female friends were asked the same questions about their marriages. No topic, no matter how uncomfortable or inappropriate, was off limits at ICOC.

148.   As further testament to the incredibly high degree of control ICOC leaders exerted over female members' bodies, Marty Fuqua convinced Jane Roe 2 that she needed a breast reduction surgery, as Marty told her it would help her be "sharper, more relatable and thinner, in order to be more attractive to the brothers."

149.   Coincidentally, Joe Sr. was removed from leadership in Seattle and relocated to Los Angeles to "heal". Jane Roe 2 was expected to forgive him. She was

brainwashed into believing that she would be condemned if she did not forgive Joe Sr. and she was instructed to go to his home and make amends. She was extremely uncomfortable by the thought of being in his home again and the mere thought of being face to face with someone who groomed her made Jane Roe 2 extremely anxious and sick to her stomach.

150.   On information and belief, Joe Sr. is now leading the Tallahassee ICC church, at McKean's specific direction and control. On information and belief, Joey Jr. has a leadership role at Thomasville, Georgia ICC church, also at the specific direction and control of McKean.

151.   Jane Roe 2 was 18 years old when she moved to Seattle and 19 when she was relocated to Los Angeles. At the age of 52, she is a licensed counselor and still suffers from debilitating nightmares regarding Joe Sr. and Joey Jr. Jane Roe 2 will, unfortunately, like many of Defendants' survivors, be plagued by this abuse for the remainder of her life.

152.   As a direct and proximate result of the abuse, at the hands of ICOC, and its leadership, Jane Roe 2 suffered and continues to suffer a litany of injuries. Among other injuries, Jane Roe 2 has experienced and will continue to experience for the rest of her life severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

**The Abuse and Torture of Jane Roe 3**

153.   In 1995 Jane Roe 3 joined ICOC and was immediately brainwashed by fellow members to believe she needed to be an ICOC member to receive eternal salvation and avert hell.

154.   In approximately 1999, Jane Roe 3 was horrified to discover that her two young daughters, ages seven and nine, had been molested by David Saracino. Jane Roe 3 was a single mother and had no support system outside of the church because of ICOC's highly exclusive and indoctrinated community. Desperate for help, Jane Roe 3 filed a police report without ICOC's assistance.

155.   ICOC allowed David Saracino to flee the Los Angeles area and resume his predatory and abusive conduct in San Diego. At the time, David Saracino was dating a single mother who was also an ICOC member. This woman had a son and daughter, the latter of whom was subsequently abused by David Saracino. The daughter's abuse could have been prevented if anyone at ICOC warned their congregations and listened to Jane Roe 3's pleas for help after her daughters were brutally abused.

156.   During the time that Jane Roe 3's daughters were being abused by David Saracino, Steve and Jacqueline Gansert-Morici were leading the East Region in Los Angeles ICOC. On information and belief, the abuse of a 3-year-old girl by David Saracino was reported to Steve and Jacqueline Gansert-Morici and other church leaders approximately 1.5 years before Jane Roe 3's daughters were abused. **ICOC did not report this explosive information to authorities, and implored other ICOC members to not report it**, and as a result, the church shares culpability for David Saracino's repeated and shameless sexual abuse of innocent girls.

157.   After Steve and Jacueline Gansert-Morici left the East Region, Rob and Connie Kosberg became the new leaders. Jane Roe 3 met with the Kosbergs during their first midweek service, which happened to be the same day she learned that her daughters were abused by David Saracino. An emergency meeting was called with Jane Roe 3, and Rob and Connie Kosberg that evening at the church. During the meeting, Rob and Connie Kosberg stated they did not know what to do with the information. Rather than contact the police, Rob and Connie Kosberg feigned helplessness to shield the church and its members from police scrutiny.

158.   Rob and Connie Kosberg repeatedly instructed Jane Roe 3 to refrain from disclosing the abuse to other members because doing so would damage those members' faith by creating a "struggle" and encouraging them to fall away from God. The congregation was never warned about the predator among them, and no one bothered to inquire if any other children were abused by David Saracino, as he was a regular Kids Kingdom worker and had access to a multitude of children.

159.   Word spread within the church regarding the abuse of Jane Roe 3's daughters, resulting in Jane Roe 3 and her daughters feeling shunned by the congregation. The family was victimized by David Saracino and the congregation compounded the damage he inflicted upon these innocents by making them feel like outcasts.

160.   Approximately 5-6 months after Jane Roe 3 discovered the abuse, she felt extremely isolated, except for the comfort and companionship of a single ICOC "brother" named Chris. Jane Roe 3 and Chris received "permission to date" from church leadership and did so within the church's "pure dating" requirements, which prohibited the couple from being physically intimate or being alone together.

161.   One fateful night, Jane Roe 3 needed a ride home from work. Chris showed up at her place of work before her 12-hour shift ended and he insisted on driving her home. She immediately felt conflicted because that meant they would be alone, in contravention of ICOC rules. Left without any other transportation options, she reluctantly agreed to accept the ride home. Chris dropped her off at home and asked to come inside and use the bathroom because he would not make it home in time to use the restroom. She agreed and asked him to enter from the back door, go straight to the bathroom and lock the back door when he left.

162.   After the couple said their goodbyes and while Jane Roe 3 was in her bedroom changing clothes to get ready for bed, Chris abruptly kicked her bedroom door open. Chris was a Karate black belt and he had also mastered other styles of martial arts, so he was physically intimidating to Jane Roe 3. When he broke through her bedroom door, he had a demonic look on his face that she had never witnessed before. He violently pushed her onto the bed, all the while Jane Roe 3 screamed, "STOP IT! GET OUT!" She desperately tried to defend herself, which seemed to enrage Chris even more. She was no match for a Karate black belt and he swiftly put her into "submission locks" using her hands and arms. He angrily told her that if she moved, her wrists would break. In sheer desperation, Jane Roe 3 cried and pleaded with him to "please stop" to

no avail. Chris choked her and taunted her by laughing maniacally while she begged him to stop torturing her.

163.   Jane Roe 3 blacked out while Chris sadistically raped her. After Chris finished, she was in a state of complete shock. After she was raped, Jane Roe 3 did not return to ICOC. She recalls hearing rumors within the congregation that she was absent from church because she was "weak and struggling". Eventually, she received a phone call from the Women's Ministry leader at the time, Kimberly Roscoe, asking her to attend a "discipleship" meeting because Chris "confessed" that they were "immoral together".

164.   Knowing that the "immoral" conduct was categorically non-consensual, Jane Roe 3 reluctantly agreed to the meeting because she wanted everyone to know the truth, that Chris had raped her. To her surprise and dismay, Jane Roe 3 was horrified that not only was Kimberly Roscoe's husband, John, present, but Chris was also in attendance.

165.   Jane Roe 3 bluntly told Kimberly and John that Chris raped her, however, they did not believe her. She insisted that she had been raped, which prompted Kimberly and John to begin asking her a litany of revolting and humiliating questions. They asked her disgusting questions like: "Did you get wet? Because if you did that means you enjoyed it!" They went so far as to aggressively ask her if she had "an orgasm!?"

166.   Once the sickening questions began, Jane Roe 3 ended the conversation and left the premises. While she was fleeing the scene of her inquisition, John Roscoe arrogantly told her that she needed to "repent" because she was "prideful". It is beyond dispute that women within ICOC were second class members who were routinely victim shamed and coerced into silence by the church's repeated directive to "support and forgive the brothers".

167.   On one occasion, a female member told Jane Roe 3 in a matter-of-fact manner, "it's always the woman's fault because we seduce the men to fall into sin." This

particular conversation was profoundly triggering and traumatizing for Jane Roe 3 in light of her own rape and that of her young children. These types of conversations were typical within ICOC and made Jane Roe 3 feel worthless and insignificant.

168.   Jane Roe 3 quickly realized that although she had not personally disclosed her rape or her daughters' abuse throughout the church, numerous individuals knew what happened and did nothing but gossip about it.

169.   Jane Roe 3 defected from ICOC over 12 years ago and she and her daughters have suffered from PTSD, and they have spent an enormous amount of time in therapy as a result of the torture they suffered.

170.   As a direct and proximate result of the abuse, at the hands of ICOC, and its leadership, Jane Roe 3 suffered and continues to suffer a litany of injuries. Among other injuries, Jane Roe 3 has experienced and will continue to experience for the rest of her life severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

## **FIRST CLAIM FOR RELIEF**
### **SEXUAL ASSAULT**
*(Against All Defendants and Does 1-100)*

171.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

172.   Defendants intentionally, willfully, and maliciously sexually assaulted and/or sexually assaulted Plaintiffs in Violation of California Penal Code §243.4.

173.   In committing the unlawful acts of sexual assault against Plaintiffs, Defendants intended to put Plaintiffs in imminent apprehension of harmful or offensive contact.

174.   Defendants put Plaintiffs in imminent apprehension of such harmful offensive contact as Plaintiffs actually believed Defendants had the ability to make harmful or offensive contact with plaintiff's person.

175.   Plaintiffs did not consent to Defendants' intended harmful or offensive contact with plaintiff, Defendants' intention to put Plaintiffs in fear of imminent apprehension of such contact.

176.   As a direct and legal result of this conduct. Plaintiffs suffered harm including, but not limited to: physical, mental, and emotional injuries related to sexual abuse; medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

177.   Defendants conduct described herein was oppressive, malicious, and despicable in that it was intentional and done in conscious disregard for the rights and safety rights of Plaintiffs, and with the substantial certainty that it would cause Plaintiffs, to suffer humiliation, mental anguish, and emotional and physical distress.

178.   Defendants' conduct as alleged constitutes malice and oppression under California Civil Code section 3294. Plaintiffs are therefore entitled to the recovery of punitive damages in an amount to be determined by the Court.

## SECOND CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*(Against All Defendants and Does 1-100)*

179.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

180.   The conduct of all Defendants as set forth in this Complaint was extreme and outrageous, and committed with the intention of causing, or reckless disregard of the probability of causing, emotional distress.

181.   A reasonable person would not expect or tolerate the sexual assault committed by Defendants.

182.   A reasonable person would not expect, accept or tolerate Defendants' unlawful sexual assault and/or sexual abuse of Plaintiffs.

183.   Defendants' conduct exceeded all bounds of that usually tolerated in a

civilized community.

184.   Defendants intended to cause Plaintiffs injury when they sexually assaulted Plaintiffs, manipulated and brainwashed Plaintiffs into silence and actively concealed Plaintiffs' abuse.

185.   Plaintiffs have suffered severe and/or extreme distress as a result.

186.   As a direct and legal result of Defendants' conduct, Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of sexual abuse; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

187.   Defendants' conduct described herein was oppressive, malicious and despicable in that it was intentional and done in conscious disregard for the rights and safety rights of Plaintiffs, and with the substantial certainty that it would cause Plaintiffs, to suffer humiliation, mental anguish and emotional and physical distress.

188.   Defendants' conduct as alleged constitutes malice and oppression under California Civil Code section 3294. Plaintiffs are, therefore, entitled to the recovery of punitive damages, in an amount to be determined by the Court.

## **THIRD CAUSE OF ACTION**

### **NEGLIGENT HIRING, SUPERVISION, AND RETENTION**

*(Against All Defendants and Does 1-100)*

189.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

190.   At all times relevant, a special relationship existed among Defendants, because Defendants were the agents each other, each of whom had the ability to control other Defendants' conduct yet failed to exert it. In doing so, Defendants created a widespread culture of acceptance of the abuse of church members, as Defendants collectively brainwashed and manipulated Plaintiffs to remain silent about the abuse and these Defendants also actively concealed the abuse to avert discovery by the

authorities.

191.   At all times herein Defendants, and each of them, negligently supervised, managed, and controlled Defendants in their membership and participation in Defendants' Church, and negligently failed to warn Plaintiffs and other members of the Church of the propensity and risk that Defendants would sexually assault, sexually abuse, and/or molest church members, a propensity and history of which Defendants, and each of them, acting through their employees, agents, and volunteers, had actual notice.

192.   During the same time period, Defendants, and each of them, were negligent in failing to exercise reasonable care to protect Plaintiffs, and other church members who participated in activities at Defendants' Church, from the risk of sexual assault, sexual abuse by perpetrators, including but not limited to Defendants.

193.   Defendants were further negligent in failing to notify law enforcement and other appropriate authority that Plaintiffs were and/or continued to be a victim of sexual assault by Defendants when they learned of this fact. Defendants' failure to report the known and/or reasonably suspected abuse of Plaintiffs, but instead Defendants perpetuated and facilitated Defendants continued sexual abuse and/or sexual assault of Plaintiffs.

194.   If Defendants satisfied their duty to take reasonable steps to protect Plaintiffs from known and/or foreseeable harm, including sexual assault, including reporting the sexual assault and/or sexual abuse to law enforcement, then some or all of the Plaintiffs' injuries would have been avoided.

195.   Prior to, during, and after the sexual assault of Plaintiffs, Defendants, through their administrators, employees, agents, and/or volunteers, had knowledge, and/or were otherwise on notice, that Defendants had and/or was engaged in, and/or presented the risk of, sexual assault of Plaintiffs, and other church members.

196.   Plaintiffs are informed, believes, and thereupon alleges that prior to, and during Defendants' sexual assault and/or sexual abuse of Plaintiffs, Defendants knew or should have known, reasonably suspected, and/or were otherwise on notice, of Defendants' unlawful conduct, as set forth in this Complaint, but failed and/or refused

to take any affirmative action, including but not limited to notifying law enforcement. Instead, Defendants directed Plaintiffs to continue to have contact with Defendants, thereby ratifying and facilitating Defendants continued sexual assault and/or sexual abuse of Plaintiffs.

197.   Defendants breached their duties by failing to use reasonable care to protect Plaintiffs from their pastor, elder, "discipler", deacon, employee, and/or agent, to wit, Defendants.

198.   If Defendants fulfilled their duty and responsibility, then Plaintiffs would not have been subject to all or most of the misconduct perpetrated against them and the resulting harm.

199.   As a direct and legal result of Defendants' conduct, Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of sexual abuse; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

200.   Plaintiffs are informed, believes, and thereupon allege that Defendants' failure to respond, investigate, terminate Defendants' employment, report, or take any other action following Plaintiffs reports of sexual assault and/or abuse by Defendants was part of Defendants' concerted effort to cover up and/or hide evidence related to Plaintiffs' sexual assaults.

## FOURTH CAUSE OF ACTION
### NEGLIGENCE
*(Against All Defendants and Does 1-100)*

201.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

202.   Defendants owed a duty of care to Plaintiffs or had a duty to control the conduct of Defendants by way of the special relationship existing between those individuals and Plaintiffs by virtue of Defendants' position of power and trust as church

leaders and "disciplers".

203.   Defendants knew or should have known, reasonably suspected, and/or were otherwise on notice, of the misconduct and sexually predatory behavior of Defendants directed toward Plaintiffs.

204.   Despite having knowledge of Defendants' misconduct, all Defendants herein failed to take any preventative action to control, curb, and/or prevent that conduct, failed to warn Plaintiffs or Plaintiffs' parents of that wrongful conduct, and/or failed to notify law enforcement, despite having a legal duty to do so.

205.   As a direct and legal result of Defendants' negligence, Plaintiffs were sexually assaulted, sexually abused, sexually harassed, and assaulted by Defendants.

206.   If Defendants fulfilled their duty and responsibility, then Plaintiffs would not have been subject to all or most of the misconduct perpetrated against Plaintiffs and the resulting harm.

207.   As a direct and legal result of Defendants' conduct, Plaintiffs suffered severe and permanent injuries including, but not limited to, physical and mental pain and suffering, severe emotional distress, physical injuries, past and-future costs of medical care and treatment, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

## FIFTH CLAIM FOR RELIEF

## VIOLATION OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ("RICO") ACT 18 U.S.C. § 1962(c)

*(Against All Defendants and Does 1-100)*

208.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

209.   Plaintiffs bring this claim for relief under the private cause of action provided by 18 U.S.C. § 1984(c), which prohibits violations of the Federal RICO Act insofar as such violation injures any person in his business or property.

210.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in

violation of 18 U.S.C. § 1962(c).

211.   The Abuse Enterprise, distinct from Defendants, is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), organized within individual ministries, funneling into regions governed by individual bishops, and headquartered in Los Angeles, California. Members of the Abuse Enterprise maintain a common purpose of extracting money from its members and perpetrating sexual abuse church members under the auspices of liturgical praxis and writings taught by its church ministers worldwide. The Abuse Enterprise began as early as 1979 and continues with a growing global membership of more than 120,000 today.

212.   Defendants have conducted and participated in the affairs of the Abuse Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5).

213.   Defendants' pattern of racketeering activity includes, but is not limited to, many repeated occurrences of the following predicate acts: sexual abuse and exploitation of church members and sex trafficking.

214.   Each Defendant, in their individual capacity, knew or should have known about the majority of the predicate acts carried out by Defendants within the Abuse Enterprise.

215.   Upon information and belief, some combination of Defendants have engaged in an uninterrupted course of unlawful conduct consisting of all of the herein described predicate acts.

216.   Defendants' pattern of racketeering activity includes, but is not limited to, many repeated occurrences of the following predicate acts: (i) violating the prohibition against human trafficking under 18 U.S.C. § 1590; (ii) laundering of monetary instruments outside of the United States with the intent to promote the carrying on of unlawful activity in violation of 18 U.S.C. §1956(a)(2); and (iii) sexual exploitation of individuals. Upon information and belief, hundreds of individuals have been sexually exploited as a result of this pattern of racketeering behavior.

217.   Upon information and belief, hundreds of individuals within Defendants' inner circles have been extorted through fear of financial and physical injury into

making large financial payments to Defendants and into providing sexual services to Defendants as a result of this pattern of racketeering behavior.

218. Upon information and belief, many millions of dollars have been trafficked out of the United States for the purposes of carrying on unlawful activity as a result of this pattern of racketeering behavior.

219. Upon information and belief, Defendants' pattern of racketeering behavior has been related and continuous since its inception. Upon information and belief, there is not only a threat of continued criminal activity, but continued criminal activity is occurring within the Abuse Enterprise at the hands of nearly all Defendants as of the writing of this Complaint.

220. Defendants and the Abuse Enterprise regularly move goods, money, and people across state lines, and are therefore engaged in interstate commerce.

221. As a direct and proximate result of Defendants' patterns of racketeering behaviors, Plaintiffs have sustained damages, including lost wages, loss of economic opportunity, loss of educational opportunity, loss of future income, loss of specific extorted payments, physical injury, severe emotional distress, and additional economic losses.

222. Plaintiffs are therefore entitled to recover damages they sustained in an amount to be proven at trial, the cost of the suit, plus a reasonable attorney's fees, pursuant to 18 U.S.C. § 1964(c).

## **SIXTH CLAIM FOR RELIEF**

### **SEXUAL BATTERY IN VIOLATION OF CAL. CIV. CODE § 1708.5**

*(Against All Defendants and Does 1-100)*

223. Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

224. Plaintiffs bring this claim for relief under Cal. Civ. Code Section 1708.5, which prohibits sexual battery.

225. As alleged herein, Plaintiffs are the victims of sexual battery perpetrated by Defendants.

226.   Cal. Civ. Code § 1708.5 prohibits any act with the intent to cause a harmful or offensive contact with an intimate part of another, and a sexually offensive contact with the person results, or any act that causes an imminent apprehension of such harmful or offensive contact and the offensive contact results.

227.   Defendants knowingly conspired and/or aided and abetted to force Plaintiffs into sexual battery with the other Defendants, and such sexual battery did, on multiple occasions, occur.

228.   Each Defendant knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Plaintiffs to be repeatedly subjected to private, egregiously offensive sexual contact with Defendants, all in furtherance of sexually battering Plaintiffs and in furtherance of the Abuse Enterprise.

229.   As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

230.   The aforementioned conduct was willful, wanton, and malicious. At all relevant times, Defendants acted with conscious disregard of Plaintiffs' rights and safety. Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiffs.

## SEVENTH CLAIM FOR RELIEF

### GENDER VIOLENCE IN VIOLATION OF CAL. CIV. CODE § 52.4

*(Against Defendants and Does 1-100)*

231.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

232.   Plaintiffs bring this claim for relief under Cal. Civ. Code Section 52.4, which prohibits acts of gender violence.

233.   As alleged herein, Plaintiffs were the victims of multiple instances of sexual battery perpetrated by Defendants and facilitated by all Defendants herein. Defendants subjected Plaintiffs to these multiple incidents of sexual battery at the hands of Defendants.

234.   Cal. Civ. Code § 52.4 prohibits commission of acts of gender violence, defined to include a physical intrusion or physical invasion of a sexual nature under coercive conditions, whether those acts have resulted in criminal complaints, charges, prosecution, or conviction.

235.   As alleged herein, Plaintiffs were repeatedly the victim of acts of gender violence by Defendants, to wit, sexual abuse.

236.   Each Defendant herein knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Plaintiffs to be repeatedly subjected to private, egregiously offensive sexual contact with Defendants, all in furtherance of committing acts of gender violence against Plaintiffs.

237.   As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

238.   The aforementioned conduct was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard of Plaintiffs' rights and safety. Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiffs.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs respectfully pray for relief as follows:

(a)    Compensatory and special damages in an amount to be proven at trial;

(b)    Statutory penalties and liquidated damages according to proof at time of trial;

(c)    Punitive and exemplary damages in an amount according to proof at the time of trial;

(d)    Pre- and post- judgment interest;

(e)    Reasonable attorney's fees and costs; and

(f)    Such other and further relief as the Court deems just and proper.

Plaintiffs respectfully demand a trial by jury on all claims so triable.

**SAMINI BARIC KATZ LLP**

Date: January 27, 2023          By:     */s/ Bobby Samini*
                                        Bobby Samini
                                        Michael Katz
                                        Steve Baric
                                        Nicole C. Prado
                                        John S. Oney, IV,
                                        Attorneys for Plaintiffs